# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

————————————————————— )
                                            )
**LOUIS SCOTT JONES**,                      )
                                            )
      **Plaintiff,**                    )
                                            )
      **v.**                           )    **Civil Action No.  04-941 (ESH)**
                                            )
**MICHAEL B. MUKASEY**,                     )
Attorney General, United States Department  )
of Justice,                                 )
                                            )
      **Defendant.**                    )
————————————————————— )

## MEMORANDUM OPINION AND ORDER

Plaintiff applied for a Special Agent position with the Federal Bureau of Investigation ("FBI"), and he received a conditional offer of employment in 1999.  The FBI thereafter rescinded its offer, which it now claims was the result of plaintiff's failure to adequately disclose information about his 1982 encounter with the police.  In 2003, plaintiff sued alleging disparate treatment and disparate impact based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  Plaintiff's claims were dismissed without prejudice because he had failed to exhaust his administrative remedies.  *See Jones v. Ashcroft*, 321 F. Supp. 2d 1, 12 (D.D.C. 2004) ("*Jones I*").  Plaintiff has now refiled his lawsuit, and upon the completion of discovery, defendant has moved for summary judgment.  With respect to the disparate treatment claim (Count II), defendant argues that plaintiff failed to exhaust his administrative remedies and has failed to rebut the FBI's legitimate reasons for rescinding its offer.  With respect to the disparate impact claim (Count I), defendant again argues exhaustion, as well as standing, and in his reply, he raises for the first time a challenge on the merits insofar as he argues that plaintiff

has failed to rebut the FBI's showing of business necessity by demonstrating the existence of an

alternate employment practice that would meet the employer's legitimate needs without a similar

discriminatory effect.  Plaintiff opposes defendant's motion and has moved to strike defendant's

belated attack on the disparate impact claim.  As explained herein, defendant's motion for

summary judgment will be denied, and the plaintiff's motion to strike will be granted.

## BACKGROUND

### I.   FACTUAL BACKGROUND

#### A.   *Plaintiff's Application*

Plaintiff first applied for a Special Agent position with the FBI in 1995.  *Jones I*, 321 F.

Supp. 2d at 3.  This first application was rejected, but when plaintiff reapplied in 1999, he

advanced to the next phase of the process, which included a series of tests and a panel interview.

*Id*.  On October 18, 1999, the FBI extended a conditional offer to plaintiff contingent upon

successful completion of a physical examination, polygraph examination, background

investigation, and an overall determination that plaintiff would be a "suitable" agent.  *Id.* at 3-4.

Plaintiff completed the FBI's Application for Employment, which is commonly known as

the "FD-140."  Section IX of the FD-140 is labeled "Court Record" and asks the applicant the

following:

> Have you ever been arrested or charged with any violation,
> including traffic, but excluding parking tickets? . . . If so, list all
> such matters even if not formally charged or no court appearance,
> or found not guilty, or matter settled by payment of fine or
> forfeiture of collateral.

(Def.'s SJ Mot., Exh. 6 at 4.)

Two incidents in plaintiff's past became relevant to his application.  First, on September

4, 1982, plaintiff was detained by the police and received a citation for a traffic offense.  *Jones I*, 321 F. Supp. 2d at 4 n.1.  While plaintiff had previously disclosed this incident when he applied for a security clearance in 1986, he acknowledges that he failed to do so on his FD-140, and he is unable to recall whether he discussed it during his personnel security interview.  (Pl.'s Resp. to Def.'s Facts ¶¶ 12-13, 17, 20.)[1]  However, plaintiff subsequently mentioned the 1982 incident during his second polygraph test.  (Pl.'s Resp. to Def.'s Facts ¶ 21.)

The second incident occurred on February 14, 1984, when plaintiff was charged with disorderly conduct by undercover police officers.  (Def.'s SJ Mot., Exh. 6 at 4.)  According to plaintiff, the officers failed to properly identify themselves, dragged him and a friend from a car while using racial epithets, and punched and kicked him while he was on the ground.  (Pl.'s Opp'n, Exh. 22 at 2; Pl.'s Facts ¶ 28.[2])  This case was dismissed, and plaintiff paid $50 for court costs even though there was no finding of probable cause.  (*Id*.)  Plaintiff disclosed this incident on his FD-140.  (Def.'s SJ Mot., Exh. 6 at 4.)

The Department of Defense Investigative Service ("DDIS") provides an alternate version of this 1984 incident.  According to plaintiff's DDIS file, which the FBI utilized during its background investigation, the officers identified themselves and asked plaintiff to back up his car in order to alleviate a traffic jam.  (Pl.'s Opp'n, Exh. 22 at 2.)  Then plaintiff and his friend allegedly became belligerent and initiated a fight with the officers.  (*Id*.)

---

[1]Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, filed Dec. 21, 2007 [hereinafter "Pl.'s Resp. to Def.'s Facts"].

[2]Plaintiff's Statement of Facts as to Which There Exists a Genuine Issue, filed Dec. 21, 2007 [hereinafter "Pl.'s Facts"].

B.      The FBI's Suitability Determination

At the time of plaintiff's application, the FBI's suitability determinations were conducted by the Bureau Applicant Employment Unit ("BAEU"). (Pl.'s Facts ¶ 5.)  Patrick Maloy was chief of the BAEU, and he reported to Michael Varnum and Michael Mason, both of whom were Section Chiefs in the FBI's Administrative Services Division. (*Id.* ¶ 6.)  Therese Rodrique was one of four program managers working under Mr. Maloy. (*Id.*)  Ms. Rodrique reviewed plaintiff's file and commented on his suitability. (*Id.* ¶ 27.)  James Burrus also examined plaintiff's application in his role as Chief of the Applicant Processing Section. (*Id.* ¶ 6.)

On July 13, 2000, Therese Rodrique recommended that the FBI discontinue plaintiff's application. (Pl.'s Opp'n, Exh. 34.)  She provided her reasoning in a note to plaintiff's file:

> Two incidents involving the applicant and law enforcement officers during which applicant was uncooperative and/or disorderly.  Applicant did not list one of the incidents on his FD-140 and he did not disclose it during his PSI [*i.e.*, personnel security interview].

(*Id.*)  Mr. Maloy concurred with Ms. Rodrique's decision (Def.'s Resp. to Pl.'s Interrog. No. 3), and on July 17, 2000, he notified plaintiff of the FBI's rescission of its job offer. (Def.'s SJ Mot., Exh. 11.)

On July 28, 2000, plaintiff wrote a letter to Mr. Maloy asking him to reconsider his decision. (Def.'s SJ Mot., Exh. 12.)  Michael Varnum, one of Mr. Maloy's superiors and the Personnel Officer for the FBI,  responded on September 11, 2000:

> During your background investigation, it was revealed that in 1982 you were arrested[3] for Failure to Submit (your driver's license) to a

---

[3]Plaintiff argues that his detention was not an "arrest" under Massachusetts law. (Pl.'s Opp'n 2.)  However, the technical classification of the 1982 incident is irrelevant.  The FD-140

> Police Officer.  You did not disclose this information on your
> application for employment or mention it during your Personnel
> Security Interview in November, 1999.  Although the charge was
> dismissed, your lack of forthrightness regarding this matter
> precludes your case from being further processed.  Forthrightness
> is an essential attribute that individuals must demonstrate in order
> to be considered for any position with the FBI.  You can be
> assured that your case was handled consistent with other
> candidates being considered for the Special Agent position.

(Def.'s SJ Mot., Exh. 13.)

Thereafter, in February 2001, Mr. Maloy's other superior, Michael Mason, wrote a letter

to plaintiff explaining the rescission by reference to plaintiff's failure to disclose the 1982

incident during his personnel security interview *and* his polygraph examinations.[4]  (Pl.'s Opp'n,

Exh. 41.)  Neither Mr. Varnum nor Mr. Mason mentioned the 1984 incident in their letters to

plaintiff.  (Def.'s SJ Mot., Exh. 13; Pl.'s Opp'n, Exh. 41.)  Nevertheless, more than one year

later, James Burrus wrote a letter to plaintiff citing the 1984 incident.  (Pl.'s Opp'n, Exh. 11.)

Mr. Burrus noted that "on two separate occasions, official records indicate you behaved in a

belligerent manner and you were uncooperative with police."  (*Id.*)

---

asks "Have you ever been arrested or charged with any violation, including traffic, but excluding
parking tickets?"  Plaintiff does not contend that this incident was merely a parking ticket, so
even if it did not qualify as an "arrest," it still fell within the scope of information requested by
the FD-140.  Nevertheless, it is noteworthy that plaintiff subsequently produced the traffic ticket
that he had received which showed the "Arrest" box crossed out and the "Complaint" box
checked (Pl.'s Opp'n, Exh. 23), but the FBI did nothing in response even though it was aware
that the police officer involved "could provide information concerning this alleged arrest."  (*Id.*,
Exh. 39.)  Moreover, Mr. Maloy testified at a deposition that he never saw the ticket with the
arrest box crossed out, but if he had, it "could [have] be[en] a mitigating consideration."  (*Id.*,
Exh. 8 at 20.)

[4]As defendant concedes, this assertion was incorrect, for it is undisputed that plaintiff
discussed the 1982 incident during his second polygraph examination.  (Defendant's Statement
of Undisputed Material Facts, filed Oct. 31, 2007 [hereinafter "Def.'s Facts"] ¶ 21.)

5

## II.     PROCEDURAL HISTORY

Plaintiff first contacted the Equal Employment Opportunity Commission ("EEOC") on

November 24, 2000, and he filed a formal complaint on December 5, 2000.  (Def.'s SJ Mot.,

Exh. 14.)  While this complaint focused on age discrimination, plaintiff also cited race as a basis

for his complaint.  (*Id*.)  After an investigation, the U.S. Department of Justice ("DOJ") issued a

Final Decision on February 24, 2003, denying plaintiff's racial discrimination claim.[5]  (Pl.'s

Opp'n, Exh. 31.)  Plaintiff appealed the Final Decision on March 28, 2003, but he withdrew his

appeal in August 2003 (prior to a final EEOC decision) to pursue his initial lawsuit.  *Jones I*, 321

F. Supp. 2d at 4.  This suit was dismissed without prejudice because he had withdrawn his

administrative appeal before the 180-day period had run in violation of 29 C.F.R. § 1614.407(d).

*Id.* at 10, 12.

Plaintiff refiled on June 8, 2004.  His claims are identical to those in his initial suit.  He

alleges that the FBI's hiring practices have a disparate impact on racial minorities (Count I), and

that the FBI's refusal to hire him constituted disparate treatment based on race (Count II).

(Compl. ¶¶ 10-12.)  Defendant has moved for summary judgment on both counts.

## ANALYSIS

## I.     EXHAUSTION

Defendant argues that plaintiff failed to exhaust his administrative remedies because he

did not contact an EEOC counselor within 45 days of the FBI's revocation of his job offer, as

---

[5]The DOJ's Final Decision did not address plaintiff's age discrimination claim because
he was 37 when he filed his complaint with the EEOC and the Age Discrimination in
Employment Act of 1967, 29 U.S.C. § 621 *et seq*., does not protect those under the age of 40.
(Pl.'s Opp'n, Exh. 31 at 2 n.1.)

required by 29 C.F.R. § 1614.105(a)(1).  (Def.'s SJ Mem. 6-7.)  Plaintiff contends that defendant

is barred from raising this defense for the first time in a motion for summary judgment.  (Pl.'s

Opp'n 6.)  In response, defendant argues that "failure to plead an exhaustion of administrative

remedies defense explicitly in the answer is not fatal" and "pleadings are not to be hyper-

technically construed."  (Def.'s Reply 2.)  Defendant also contends that he was not required to

assert this defense under Fed. R. Civ. P. 8(c), since it is not included in the list of affirmative

defenses that a party must raise when responding to a pleading.  (*Id.*)

Defendant's position is without legal support.  In fact, exhaustion is generally considered

to be an affirmative defense falling within the scope of Fed R. Civ. P. 8(c).  *See Jones v. Bock*,

127 S. Ct. 910, 919 (2007) ("the usual practice under the Federal Rules is to regard exhaustion as

an affirmative defense").  Therefore, it is improper for defendant to raise this issue for the first

time in his summary judgment motion.  *See Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126

F.3d 339, 345 (D.C. Cir. 1997) ("In order to preserve the notice purpose of Rule 8(c) and the

discretionary structure of Rule 15(a), we hold that Rule 8(c) means what it says: a party must

first raise its affirmative defenses in a responsive pleading before it can raise them in a

dispositive motion.").

Defendant tries to avoid *Harris* by distinguishing between a statute of limitations defense

and one based on exhaustion.  (Def.'s Reply 3.)  This will not work.  Exhaustion and statute of

limitations are comparable in that both are affirmative defenses in a Title VII suit.  *See Williams

v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997) ("In Title VII actions, failure to exhaust

administrative remedies is an affirmative defense in the nature of statute of limitations."); *see

also Carter v. Wash. Metro. Area Transit Auth.*, 503 F.3d 143, 145 (D.C. Cir. 2007) (a Title VII

7

exhaustion requirement "essentially functions as a statute of limitations").

Defendant argues, nonetheless, that even if exhaustion is classified as an affirmative defense, "it may be invoked in a Rule 12(b)(6) motion if the complaint somehow reveals the exhaustion defense on its face."  (Def.'s Reply 2, quoting *Thompson v. Drug Enforcement Admin.*, 492 F.3d 428, 438 (D.C. Cir. 2007).)  However, this defense is not apparent on the face of the complaint.  While the complaint states when the FBI rescinded its offer, it is silent as to when plaintiff first contacted the EEOC.  (Compl. ¶ 8.)  Accordingly, it is impossible to detect the exhaustion issue from the face of the complaint.

In the alternative, defendant cannot prevail on his exhaustion argument, for there is a genuine issue of material fact as to whether plaintiff had notice of the 45-day requirement.  The letter rescinding the offer did not inform plaintiff of his right to sue or the time limits for doing so.  (Def.'s SJ Mot., Exh. 11.)  Furthermore, plaintiff alleges that he "was not aware of any time limits on filing an EEO complaint," and "he never saw any posters or any information concerning the EEO process, his rights, or time limits."  (Pl.'s Opp'n 9.)  When a plaintiff "shows that he or she was not notified of the time limits and was not otherwise aware of them," the agency must extend the 45-day time limit. 29 C.F.R. § 1614.105(a)(2).  *See also Harris v. Gonzales*, 488 F.3d 442, 445 (D.C. Cir. 2007) (denying summary judgment because the court "cannot say that no reasonable jury, viewing the evidence in the light most favorable to [plaintiff] and drawing all inferences in her favor, could conclude that she lacked constructive notice of the 45-day requirement").  Therefore, defendant's exhaustion argument fails for this

reason as well.[6]

## II.    *DELGADO*

Because plaintiff's proof regarding his disparate treatment and disparate impact claims

relies on Judge Robertson's decision in *Delgado v. Ashcroft*, No. 99-cv-2311(JR), 2003 WL

24051558, at *1-11 (D.D.C. May 29, 2003), it is instructive to review that case before addressing

defendant's specific arguments in support of summary judgment.

The facts of *Delgado* are very similar to those in this case.  Adam Delgado and four other

plaintiffs applied to be Special Agents at the FBI during the period from 1994 to 1998.  *Id*. at *1-

2.  Three of the plaintiffs are Hispanic and two are African-American.  *Id*. at *3.  All of the

plaintiffs successfully completed the initial phase of the hiring process, but in each case, the FBI

discontinued the application, citing "lack of candor" as a reason for four of the five.  *Id*. at *1-2,

*4.  With respect to the other plaintiff, two special agents commented that he was "arrogant,

egotistical, snide, and condescending."  *Id*.  Plaintiffs sued alleging disparate treatment and

disparate impact.

Two of the principal decision-makers in the instant case were also involved in *Delgado*.

During the relevant time period in *Delgado*, Patrick Maloy was head of the BAEU and Therese

Rodrique worked under him.  *Id*.  Just as in the instant case, Ms. Rodrique made the preliminary

suitability determination and Mr. Maloy reviewed her findings.  *Id*.  Ms. Rodrique had prepared

---

[6]Defendant makes two additional arguments.  First, he contends that an exhaustion defense is incorporated into the following statement:  "The Complaint contains certain claims upon which relief may not be granted."  (Def.'s Answer, Third Defense.)  Clearly, this conclusory statement falls far short of the specificity required by Fed. R. Civ. P. 8(c).  Second, defendant argues that plaintiff did not check the box indicating race in his administrative complaint.  This argument was rejected in *Jones I*, so it need not be discussed again.  *See Jones I*, 321 F. Supp. 2d at 10 n.7.

"adjudicative guidelines" to aid the decision-making process, but she acknowledged that she did not rely solely on these guidelines. *Id*. Instead, she "evaluated applicants according to a number of what she called 'dimensions,' including cooperativeness, conscientiousness, emotional maturity, integrity/honesty, initiative, and judgment." *Id*. Also, Mr. Maloy confirmed that "there was never any validation of the suitability decision process" and "he had no discussions with industrial psychologists about the guidelines." *Id*. at *5.

The *Delgado* plaintiffs also relied on two experts. Dr. Thomas DiPrete, a statistician, analyzed the "discontinuation rate" for white, Hispanic, and African-American applicants. *Id*. at *3. He found that the rates for Hispanics and African-Americans were higher than that for whites by a statistically significant amount. *Id*. Specifically, the disparity between Hispanics and whites was significant at five standard deviations, and that between African-Americans and whites was significant at six standard deviations. *Id*. According to Dr. DiPrete's analysis, there is a roughly one-in-one-million probability that these disparities are caused by chance alone. *Id.*

Dr. Sheldon Zedeck, an industrial psychologist, wrote a report about the FBI's suitability determination process. *Id*. at *11. Dr. Zedeck identified numerous deficiencies in this process:

> (1) the PSI and Background investigations were unstructured in format and scoring;
> (2) there were no benchmarks against which to evaluate an applicant's responses or any other gathered information;
> (3) considerable subjective discretion existed with respect to how to evaluate and interpret information;
> (4) deficient training in the use of the PSI and Background investigation;
> (5) no controls or safeguards in the process;
> (6) no evidence for the validity of the process and its components.

(Pl.'s Opp'n, Exh. 58 at 2.)

Based on this evidence, the Court reached certain conclusions of law which are of

relevance to this case.  First, he found that "[t]he suitability determination process is unquestionably subjective." *Delgado*, *id.* at *7.  Second, he determined that Dr. DiPrete's testimony was sufficient to establish a *prima facie* case of disparate impact.  *Id*.  Finally, he concluded that the FBI's business necessity defense failed to rebut plaintiffs' *prima facie* case of disparate impact.  *Id*. at *10.  Defendant had the burden of showing that "its decision-making process -- and the subjectivity inherent in that process -- is job-related and consistent with business necessity."  *Id*. (citation omitted).  The Court ruled that defendant failed to meet this burden.  *Id*.  And, with respect to the disparate treatment claim, the Court observed:  "[plaintiffs] may not be angels, but there were all kinds of less angelic white people who were . . . selected, notwithstanding similar behavior."  (Pl.'s Opp'n, Exh. 68.)

## III.   DISPARATE TREATMENT CLAIM

As was the case in *Delgado*, defendant argues here that plaintiff's alleged lack of candor was a legitimate, non-discriminatory reason for rescinding the job offer, and that plaintiff has failed to demonstrate that this reason was merely a pretext for discrimination..  (Def.'s SJ Mem. 17, 20-21.)  In response, plaintiff cites five grounds to support his claim of pretext: 1) similarly situated white applicants were found suitable despite serious issues regarding their suitability (Pl.'s Opp'n 16); 2) according to an expert's statistical analysis, 19.53% of African-American applicants were found unsuitable in comparison to 9.7% of white applicants (*id*. at 21-22); 3) the FBI's hiring criteria were subjective, unreliable and unrelated to the job of Special Agent (*id*. at 22-24); 4) the FBI kept changing the reasons for its decision to rescind plaintiff's offer (*id*. at 24-25); and 5) the FBI failed to modify its employment policies, despite evidence of a disparate impact on minority applicants (*id*. at 25-26).

The D.C. Circuit recently simplified the framework for addressing disparate treatment claims in the context of a summary judgment motion:

> In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not -- *and should not* -- decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.  Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).  Therefore, the only question here is whether plaintiff has produced sufficient evidence for a reasonable jury to conclude that defendant's asserted reason for rescinding the job offer was merely a pretext for race discrimination.  As explained herein, plaintiff has satisfied this burden.

A.  *Analysis of White Applicants Who Were Found Suitable*

Plaintiff obtained the files of 100 randomly selected white applicants who were found to be suitable.  (Pl.'s Opp'n 16.)  He argues that eleven of these applicants were found suitable and hired despite their failure to disclose past misconduct.  (Pl.'s Facts ¶¶ 51-69.)  While the circumstances of some of the white applicants appear to be sufficiently distinguishable from plaintiff's situation,[7] the majority are similar enough to at least raise an issue of fact.  In one

------

[7]For example, Applicant 75 was a member of the FBI Police at the time of his application for the Special Agent position.  Unlike plaintiff, "the FBI had a first-hand employment history with this on-board applicant and could use his performance as an FBI police officer to gauge his

example, a police officer failed to disclose four citizen complaints that had been lodged against

him.  (Pl.'s Opp'n, Exh. 48.)  In another, the applicant failed to disclose five to ten separate

thefts from his previous employer.  (Pl.'s Opp'n, Exh. 46.)  The FBI forgave the applicant's

failure to disclose the thefts because "the applicant was between 15 to 18 years old when this

event occurred."  (*Id*. at 3.)  However, even though plaintiff was 18 years old at the time of his

1982 encounter with the police, the FBI did not view his age as a mitigating factor.  It is also

significant that several of the white applicants had the opportunity to explain their omissions.[8]

By comparison, when plaintiff asked for the opportunity to explain his 1982 encounter with the

police, he was told that "[his] lack of forthrightness . . . *precludes* [his] case from being further

processed."  (Def.'s SJ Mot., Exh. 13) (emphasis added).

Defendant attacks plaintiff's analysis by arguing that the comparators are not similarly

situated to plaintiff, but these disputes will have to be resolved by a jury.  *See George v. Leavitt*,

407 F.3d 405, 414-15 (D.C. Cir. 2005) ("Whether two employees are similarly situated

ordinarily presents a question of fact for the jury.") (internal citations and quotations omitted).

Defendant also notes that plaintiff failed to examine the files of successful African-American

applicants or unsuccessful white applicants with candor issues.  (Def.'s Reply 8.)  While such

information may well be relevant to the issue of pretext, its absence does not defeat plaintiff's

claim.

It is useful to contrast this situation from one where a plaintiff's reliance on similarly

---

suitability to be an agent."  (Defendant's Response to Plaintiff's Evidence Concerning Alleged
Comparables, filed May 5, 2008 [hereinafter "Def.'s Resp. re Comparables"] at 1.)

[8]*See, e.g.*, Pl.'s Opp'n, Exhs. 45, 48.

13

situated individuals was found to be deficient.  In *Waterhouse v. District of Columbia*, 124 F.

Supp. 2d 1, 13-14 (D.D.C. 2000), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002), a white woman argued

that she was similarly situated to six African-American managers who were not fired despite

alleged performance issues.  In denying plaintiff's claims, the Court noted that she failed to

demonstrate that these individuals were similarly situated:

> To be considered "similarly situated," the individuals with whom
> the plaintiff seeks to compare []her treatment must have . . . been
> subject to the same standards and have engaged in the same
> conduct without such differentiating or mitigating circumstances
> that would distinguish their conduct or the employer's treatment of
> them for it.

*Id*. (internal citations and quotations omitted).  In *Waterhouse*, plaintiff failed to provide basic

information about some of the individuals she identified for comparison, such as their job titles.

*Id*.  More importantly, because she did not provide any specifics about their alleged performance

problems, it was impossible to make any meaningful comparisons.  *Id*.

The instant case is markedly different from *Waterhouse*.  First, plaintiff is comparing

himself to a relatively homogenous group of people.  All of the white applicants identified by

plaintiff were seeking the same position as a Special Agent, and all went through the same

application process that he did.  Second, plaintiff has provided enough specific details about the

white applicants so that a meaningful comparison can be made.  To the extent that defendant

disagrees with plaintiff's inferences, this is a matter of fact for a jury.

B.     *Statistical Disparities in Rejection Rates*

To demonstrate pretext, a plaintiff can also rely on evidence of statistical disparities.  *Aka*

*v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1295 n.11 (D.C. Cir. 1998).  Plaintiff relies on Dr.

Thomas A. DiPrete, the same expert who testified at the *Delgado* trial.  Dr. DiPrete calculated

14

the proportion of African-American applicants deemed unsuitable and compared this to the rate

for white applicants.  (Pl.'s Opp'n, Exh. 55 at ¶ 6.)  Dr. DiPrete found that 19.53% of African-

American applicants were found unsuitable, while only 9.70% of white applicants were

disqualified based on suitability.  (*Id*.)  According to Dr. DiPrete, this difference is statistically

significant at over six standard deviations (*id*. at ¶ 7), which is much higher than the

conventional threshold of two to three standard deviations.  *See Berger v. Iron Workers*

*Reinforced Rodmen Local 201*, 843 F.2d 1395, 1412 (D.C. Cir. 1988) (internal citations

omitted).

Relying on *Minority Employees at NASA v. Beggs*, 723 F.2d 958, 962 (D.C. Cir. 1983),

defendant suggests that such statistical evidence is only relevant to plaintiff's *prima facie* case.

(Def.'s Reply 16.)  While the D.C. Circuit did hold that such evidence may establish a *prima*

*facie* case, it did not preclude its consideration with respect to the issue of pretext.  On the

contrary, the Court noted that "[s]tatistical and other comparative information is clearly 'relevant

to the claim' of an individual plaintiff in a Title VII case."  *Id*.  *See also Cook v. Boorstin*, 763

F.2d 1462, 1468 (D.C. Cir. 1985) ("a disparate treatment plaintiff may employ statistics

concerning the employment practices of the defendant to rebut explanatory defenses as

pretextual" (citing *Minority Employees at NASA*, 723 F.2d at 962)).

Defendant also criticizes Dr. DiPrete's methodology, saying that he relied on

"discontinuation codes" produced by the FBI that "may be unreliable" and may "contain[]

anomalies."  (Def.'s Reply. 10-11.)  If the FBI produced unreliable data, it certainly cannot fault

the plaintiff.[9]  Moreover, any dispute regarding the reliability of the data hardly defeats the

sufficiency of plaintiff's showing of pretext; rather, at best, it only raises an issue of fact for the

jury.

     C.    *Subjectivity in the Hiring Process*

     Plaintiff also argues pretext based on the FBI's "highly subjective" hiring criteria.  *See*

*Aka*, 156 F.3d at 1298 (internal citations and quotations omitted).  In making this argument,

plaintiff relies on *Delgado*, where the Court found:

> The evidence showed a completely subjective and internally
> inconsistent process, with people at different levels establishing
> their own idiosyncratic sets of criteria and reaching inconsistent
> results.  Different individuals could look at the same case file and
> have a completely different opinion as to whether that particular
> candidate lacked candor or not . . . .

(Pl.'s Opp'n 23, citing *Delgado*, *id*. at *10.)  While the *Delgado* case covered a period of time

that predated plaintiff's application, Dr. Sheldon Zedeck, the industrial psychologist who

testified about the suitability determination process in *Delgado*, reviewed the materials from this

case and concluded that "I do not see how any of the deficiencies identified in my earlier report

have been rectified."  (Pl.'s Opp'n, Exh. 58 at 3.)

     Finally, plaintiff relies on deposition testimony by FBI employees who effectively

acknowledged the subjectivity in the process.  (Pl.'s Opp'n 23-24.)  When asked whether failure

to disclose an arrest automatically leads to rejection for lack of candor, Ms. Rodrique replied, "I

am very reluctant to make blanket statements like that.  I mean, I would have to look at the entire

case file."  (Pl.'s Opp'n, Exh. 38 at 19.)  Mr. Varnum also declined to say that all applicants who

---

     [9]In *Delgado*, the Court rejected a similar argument by defendant, and determined that any
coding inconsistencies did not defeat plaintiffs' *prima facie* case.  *See Delgado*, *id.* at *7.

fail to disclose violations are necessarily unsuitable.  (Pl.'s Opp'n, Exh. 9 at 46-49.)  Instead, he

said that "wherever there was a question where something was not disclosed, . . . there was a red

flag that went up in that unit to look at it and to evaluate the suitability."  (*Id*. at 49.)

Defendant questions the relevance of *Delgado*, arguing that the FBI has changed its

process since the time period analyzed in that case.  (Def.'s Reply 14.)  This argument is

unpersuasive, since two of the key decision-makers in this case, Ms. Rodrique and Mr. Maloy,

were also overseeing the suitability determinations in *Delgado*.  *Id*. at * 4.  Also, based on Dr.

Zedeck's report, there is at least an issue of fact regarding defendant's contention that the hiring

process has changed significantly.

Defendant also attacks the deposition testimony as "bare, single-issue hypotheticals

without reference to specific applicant files or fact patterns."  (Def.'s Reply 15.)  Defendant does

not dispute the fact that such testimony is relevant to the question of subjectivity, he merely

argues that it is "unpersuasive."  (*Id*.)  While these criticisms may go to the weight of the

evidence, they do not defeat plaintiff's claim.

Defendant also contends that *Aka*'s warning about highly subjective criteria should not

apply to this case for two reasons.  (Def.'s Reply 12-13.)  First, unlike the situation in *Aka*,

defendant argues that plaintiff was not "otherwise significantly better qualified than the

successful applicant." *Aka*, 156 F.3d at 1298.  Second, defendant contends that in *Aka* the alleged

discrimination "arose from personality-driven subjectivity," whereas in plaintiff's case "an arrest

or court record can be objectively verified."  (Def.'s Reply 13.)  With regard to the first point,

even defendant acknowledges that *Aka* is not limited only to situations where the plaintiff is

significantly better qualified.  (*Id*. at 12.)  Rather, *Aka* stands for the proposition that subjectivity

is "[p]articularly" suspicious in such situations.  *Aka*, 156 F.3d at 1298.  Defendant's second

point is misplaced, for plaintiff's subjectivity claim is aimed at the suitability decision-making

process, not the records themselves.  In other words, a record can be used in a subjective manner

if an employer retains discretion to decide when a "lack of candor" can become disqualifying.

Finally, defendant attempts to use the FBI's Adjudication Guidelines for Suitability as

proof that the process is not overly subjective.  Defendant argues that the guidelines "provide

concrete examples upon which to evaluate a candidate's suitability for FBI Employment."

(Def.'s Reply 11-12.)  However, in *Delgado*, Ms. Rodrique admitted that she did not rely solely

on the guidelines that she had created.  *Delgado*, *id*. at *4.  She also evaluated candidates based

on vague "dimensions," such as "cooperativeness" and "emotional maturity."  *Id*.  In any case,

these guidelines do not defeat plaintiff's claim given the other evidence proffered by the

plaintiff.

### D.    *Shifting & Incorrect Explanations for Rescinding Plaintiff's Job Offer*

As discussed above, the FBI provided inconsistent reasons for rescinding plaintiff's offer.

And, in at least one instance, an asserted reason was factually incorrect.  *See* note 4, *supra*.  As

plaintiff correctly argues, one can infer pretext from this inconsistency.  *See Southwest*

*Merchandising Corp. v. N.L.R.B.*, 53 F.3d 1334, 1344 (D.C. Cir. 1995) ("[A] jury can infer

pretext and thus discrimination where employer provides shifting and inconsistent explanations

for its action."); *see also Aka*, 156 F.3d at 1295 (evidence that an employer's asserted reason is

incorrect may create an inference of pretext).

Defendant maintains that the FBI had a consistent rationale:  "Mr. Jones did not fully and

frankly disclose his past negative run-ins with law enforcement."  (Def.'s Reply 15.)  Defendant

suggests that this rationale applies equally to both the 1982 and 1984 incidents, and he contends

that the fact that some FBI employees "focused on one incident over another does not shift or

change the underlying initial rationale for the non-selection." (*Id.* 16.)  However, this rationale

is not consistent, for the 1984 incident was revealed on plaintiff's FD-140 (Def.'s SJ Mot., Exh.

6 at 4), so defendant's argument makes no sense.  Moreover, defendant ignores the fact that one

of the reasons asserted by Mr. Mason was factually incorrect.  *See* note 4, *supra*.  Therefore,

plaintiff can properly rely on defendant's shifting explanations to support his claim of pretext.

Thus, when considered collectively, plaintiff's evidence raises a jury question as to the

issue of pretext, thereby defeating defendant's claim that he is entitled to summary judgment on

Count II.[10]

## IV.   DISPARATE IMPACT CLAIM

### A.     *Exhaustion*

As defendant acknowledges, this Court has already rejected his exhaustion argument:

> [T]he Court will not dismiss plaintiff's disparate impact claim for
> failure to exhaust administrative remedies by neglecting to include
> it in his administrative charge. . . . [R]equiring him to plead with
> specificity the legal theory under which he was proceeding would
> place too heavy a burden on an individual untrained in the
> complexities of Title VII administrative process.

*Jones I*, 321 F. Supp. 2d at 9-10 (internal citations omitted).  Defendant now relies on *Brady v.*

*Livingood*, 360 F. Supp. 2d 94, 100 (D.D.C. 2004), which requires that "a plaintiff, at a

minimum, allege *some* statistical disparity, however elementary, in order for the defense to have

---

[10]Defendant also attacks plaintiff's contention that the FBI failed to modify its
employment policies despite evidence of a disparate impact on minority applicants.  (Def.'s
Reply 16-21.)  However, the Court need not address this argument, since, even without it,
plaintiff has more than enough to proceed to trial.

any sense of the nature and scope of the allegation the plaintiff is seeking to prove."  However,

defendant's exhaustion argument is without merit.  First, as discussed above, exhaustion is an

affirmative defense that defendant should have raised in his answer.  Second, *Brady* addresses

deficiencies in a complaint filed in court with the assistance of counsel.  *See id.*, No. 02-cv-

802(RJL), Civil Docket.  The situation here is quite different, as plaintiff filed his administrative

charge without the benefit of counsel.  *See Clemmons v. U.S. Dep't of Justice*, No. 06-cv-

305(RCL), 2007 WL 1020796, at *7 (D.D.C. Mar. 30, 2007) ("plaintiff is subject to a liberal

pleading standard because he is proceeding *pro se*").  Finally, as previously found, other courts

have reached the same conclusion on exhaustion that this Court reached in *Jones I*.  *Id.*, 321 F.

Supp. 2d at 9.

   B.  *Standing*

   Defendant also argues that plaintiff lacks standing because "he is unable to show that a

policy having a discriminatory impact was the reason his conditional offer was revoked."

(Def.'s SJ Mem. 23.)  Defendant relies on *Dressler v. Martinez*, No. 04-5188, 2005 WL 79038,

at *1 (D.C. Cir. Jan. 12, 2005), where the D.C. Circuit found that plaintiff lacked standing

because he had been disqualified for failing to submit proof of certain educational requirements,

rather than for his failure to meet the requirements themselves.  This case is inapposite, as

plaintiff is challenging the suitability decision-making process itself.  Defendant also relies on

*Melendez v. Ill. Bell. Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996), which held that in a disparate

impact case the plaintiff must show that he was qualified for the job.  However, plaintiff satisfies

*Melendez*, since he has produced sufficient evidence to support his claim that he was as qualified

as other white applicants who were hired notwithstanding issues as to their suitability.

C.       *Merits Analysis of the Disparate Impact Claim*

In his reply, defendant attempts to raise two new arguments.  First, he argues that the FBI's subsequent organizational changes preclude plaintiff's claim for injunctive relief.  (*Id.* at 21-22.)  Second, he argues that plaintiff "fails to allege . . . a realistic alternative which creates less of a disparity but which still meets the employer's legitimate needs."  (*Id.* at 22.)

Plaintiff has moved to strike these arguments because they were raised for the first time in defendant's reply.  As the D.C. Circuit has consistently held, the Court should not address arguments raised for the first time in a party's reply.  *See, e.g.*, *Am. Wildlands v. Kempthorne*, No. 07-5179, 2008 WL 2651091, at *8 (D.C. Cir. July 8, 2008) ("We need not consider this argument because plaintiffs . . . raised it for the first time in their reply brief."); *McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only unfair to an appellee, but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered.") (internal citation omitted).  Therefore, the plaintiff's motion to strike these arguments will be granted.

However, even if the Court were to entertain defendant's new arguments, his motion would be denied.  First, it is a question of fact whether an organizational change has corrected the alleged discrimination.  *Cf. Butler v. Home Depot, Inc.*, No. C-95-2182(SI), 1997 WL 605754, at *16 (N.D. Cal. Aug. 29, 1997) (finding that the sufficiency of a corrective measure is a factual question that need not be resolved by a court considering a summary judgment motion).

Second, defendant's argument about alternatives is misplaced.  In cases such as this, where subjective hiring methods are challenged, an employer has the burden of showing that "its decision-making process -- and the subjectivity inherent in that process -- is job-related and

consistent with business necessity."  *Delgado*, *id*. at *10 (citation omitted).  It is only after this

burden has been met that plaintiff must identify alternatives.  *Id*. at *11 n.13 ("Since defendant

failed to show that its subjective suitability decision-making process was job-related, plaintiff

did not need to submit evidence of an effective alternative process.").  Since defendant has not

met that burden here, the issue of available alternatives is not relevant.  *Id.  See also McReynolds*

*v. Sodexho Marriott Services, Inc.*, 349 F. Supp. 2d 1, 28 (D.D.C. 2004).

## CONCLUSION

Therefore, for the foregoing reasons, plaintiff's Motion to Strike Portions of Defendant's

Reply Brief [#37] is **GRANTED** and defendant's Motion for Summary Judgment [#26] is

**DENIED**.  A status conference is set for July 22, 2008, at 1:45 p.m.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: July 10, 2008